## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| GOLFVIEW DEVELOPMENTAL | ) | Case No. 05-27057 |
| CENTER, INC., | ) | |
| | ) | Honorable Jacqueline P. Cox |
| Debtor. | ) | |

### NOTICE OF HEARINGS

PLEASE TAKE NOTICE that on July 14, 2005, at the hour of 9:30 a.m. or as soon thereafter as counsel may be heard, we shall appear before the Honorable Jacqueline P. Cox in the courtroom 619 or the courtroom usually occupied by her in the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago, Illinois 60604, or before any other judge who may be sitting in her place and stead, and shall then and there present the following motions, copies of which are attached hereto and hereby served upon you, at which time and place you may appear if you see fit.

1) APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF WILDMAN, HARROLD ALLEN & DIXON LLP AS ATTORNEYS FOR THE DEBTOR; and

2) DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107 AND 1108 (I) AUTHORIZING CONTINUED USE OF CERTAIN EXISTING (A) CASH MANAGEMENT SYSTEM, (B) BANK ACCOUNTS, AND (C) BUSINESS FORMS; and

3) DEBTOR'S MOTION FOR ORDER AUTHORIZING (I) SECURED POSTPETITION FINANCING AND (II) ADEQUATE PROTECTION.

Respectfully submitted,

GOLFVIEW DEVELOPMENTAL CENTER, INC.

By: _____
       One of its Proposed Attorneys

David J. Fischer (Atty. #813745)
Scott A. Semenek (Atty. #6209999)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 201-2000

1548522_1.DOC

## CERTIFICATE OF SERVICE

I, Scott A. Semenek, an attorney, certify that I have this date caused a copy of the following, filed by Debtor Golfview Developmental Center, Inc., to be served upon the U.S. Trustee, the Debtor's twenty largest unsecured creditors, and other parties in interest, by Overnight Express Mail, at the addresses listed on the attached Service List:

1)   **APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF WILDMAN, HARROLD ALLEN & DIXON LLP AS ATTORNEYS FOR THE DEBTOR; and**

2)   **DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107 AND 1108 (I) AUTHORIZING CONTINUED USE OF CERTAIN EXISTING (A) CASH MANAGEMENT SYSTEM, (B) BANK ACCOUNTS, AND (C) BUSINESS FORMS; and**

3)   **DEBTOR'S MOTION FOR ORDER AUTHORIZING (I) SECURED POSTPETITION FINANCING AND (II) ADEQUATE PROTECTION.**

Dated:  July 12, 2005.

SCOTT A. SEMENEK

1548520_1.DOC

## GOLFVIEW DEVELOPMENTAL CENTER, INC.
## SERVICE LIST

Health Management Systems
Attn: Anthony R. Miner
9555 West Golf Road
Des Plaines, IL 60016
Phone: 847-827-6628
Fax: 847-827-0948

Illinois Department of Public Aid
Attn: Mashelle Rose
Bureau of Prog. & Reimb. Analysis
P.O. Box 19491
Springfield, IL 62794
Phone: 217-524-7110
Fax: 217-524-2530

Bertram L. Miner
950 Sheridan Road
Glencoe, IL 60022
Phone: 847-835-4453
Fax: 847-835-4711

Philadelphia Insurance Companies
P.O. Box 8500-8955
Philadelphia, PA 19178

Simplex-Grinnell
Dept. CH 10320
Palatine, IL 60055
Phone: 630-834-2300
Fax: 630-948-1150

First Insurance Funding Corporation
450 Skokie Boulevard
Suite #1000
Northbrook, IL 60065
Phone: 800-837-2511
Fax: 847-509-7115

Golfview Partnership Venture
Attn: Anthony R. Miner
9555 West Golf Road
Des Plaines, IL 60016
Phone: 847-827-6628
Fax: 847-827-0948

Glenkirk Association for Retarded Citizens
Attn: Robert Suder
3504 Commercial Drive
Northbrook, IL 60062
Phone: 847-272-5111
Fax: 847-272-7350

American International Companies
P.O. Box 382014
Pittsburgh, PA 15250
Phone: 800-645-2259
Fax:

Professional Medical, Inc.
Attn: Matt Barnes
1917 Garnet Court
New Lenox, IL 60451
Phone: 800-648-5190
Fax: 815-726-7416

On-Site Dental Services
Attn: Dr. George A. Demeros
P.O. Box 3742
Barrington, IL 60011

Midwest Mechanical Services
540 Executive Drive
Willowbrook, IL 60527
Phone: 800-214-3690
Fax: 630-655-0730

Direct Supply Equipment
Box 88201
Milwuakee, WI 53288
Phone: 414-358-2805
Fax: 414-358-6811

Comprehensive Therapeutics, LTD
3703 West Lake Avenue
Suite 200
Glenview, IL 60025

Mcikem Supply, Inc.
Attn: Bob Meier
50 Joey Drive
Elk Grove Village, IL 60007
Phone: 847-427-3344
Fax: 847-427-3348

Dr. Brian Chicoine
Advocate Medical Group
1999 Dempster Street
Park Ridge, IL 60068

Mr. Bill Belkov
Field Examiner
National Labor Relations Board, Region 13
200 West Adams Street – Suite 800
Chicago, Illinois 60606-5208
Fax: 312-886-1341

United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606
Fax: 312-886-5794

American Honda Finance Corp.
P.O. Box 650024
Dallas, TX 75265

Kcyth Technologies, Inc.
P.O. Box 1132
Glenview,IL 60025
Phone: 847-433-0000
Fax: 847-926-0008

Netsight, Inc.
Attn: Rick Agnew
5 Revere Drive
Suite 200
Northbrook, IL 60062
Phone: 847-559-0880
Fax: 847-559-0890

Anderson Elevator Co.
Attn: Greg Gibbs
South West Industries, Inc.
2801 South 19th Avenue
Broadview, IL 60155
Phone: 708-345-9710
Fax: 708-345-9507

The Brickman Group, Ltd.
P.O. Box 71358
Chicago, IL 60694
Phone: 847-956-3900

Ms. Julie Kwiek
Director of Collective Bargaining
SEIU, Local 4
7026 West North Avenue
Chicago, Illinois 60707

Vicki Peloguin
Parkway Bank & Trust Co.
4800 North Harlem Avenue
Harwood Heights, IL 60706
Phone: 708-867-6600
Fax: 708-867-1119

Ford Credit
P.O. Box 219825
Kansas City, MO 64121-9825

1551926_1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 11** |
| | ) | |
| **GOLFVIEW DEVELOPMENTAL** | ) | **Case No. 05-27057** |
| **CENTER, INC.,** | ) | |
| | ) | **Honorable Jacqueline P. Cox** |
| Debtor. | ) | |
| | ) | |

## APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107, AND 1108 AUTHORIZING USE (A) CENTRALIZED CASH MANAGEMENT SYSTEM, (B) EXISTING BANK ACCOUNTS, AND (C) EXISTING BUSINESS FORMS

Golfview Developmental Center, Inc., debtor and debtor-in-possession in this Chapter 11 case (the "Debtor") requests by this motion (the "Motion"), entry of an order under 11 U.S.C. §§ 105, 363, 1107 and 1108 authorizing the Debtor's continued use of existing (a) cash management system, (b) bank accounts, and (c) business forms. In support thereof, the Debtor respectfully represents and states as follows:

### Jurisdiction

1.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.

## Background

2.     On July 7, 2005 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in the management and possession of its business as debtor in possession.

3.     No trustee or examiner has been appointed in this chapter 11 case, and no committee has been appointed or designated.

4.     The Debtor organized on September 19, 1977, as an Illinois corporation. As of the date of this Petition, the Debtor's principal place of business is located at 9555 West Golf Road, Des Plaines, Illinois 60016-1599.

5.     The Debtor has one shareholder, Bertram Miner.

6.     The Debtor has been operating as a long-term care facility for developmentally disabled adults since 1977. At all relevant times, the Debtor has been licensed by the State of Illinois Department of Public Health as an Intermediate Care Facility for the Developmentally Disabled, with a capacity of 135 unrestricted beds.

7.     Originally, the Debtor operated in a building constructed in the 1950's located at 9555 West Golf Road, Des Plaines, Illinois. However, Debtor moved to a newly constructed facility located on the formerly vacant lot and parking lot adjacent to the original facility.

8.     The Debtor provides the following services to its approximately 135 patients:

a.     nursing care and supervision;
b.     life skills training;
c.     financial skills training;
d.     self medication training;
e.     sexual education;
f.     developmental and prevocational training;
g.     behavior management counseling;
h.     occupational rehabilitation;
i.     physical rehabilitation;

j.      speech rehabilitation;
k.      social services;
l.      meals and dietary services;
m.     housekeeping and maintenance services;
n.      recreational and therapeutic activities;
o.      field trips; and
p.      maintenance.

9.      All of the Debtor's clients are inpatients whose care is funded directly by the State

of Illinois and indirectly through the State of Illinois and the federal government. The Debtor

receives a proscribed per diem rate of $144.01 per patient based on a certain statutory

calculation.[1] The State of Illinois, through the Department of Human Services, pays the per diem

directly to the Debtor but reduces the per diem amount by any social security and social security

disability payments over $30.00 each that are received by the patient from the government.[2] The

State of Illinois also reduces the per diem amount by a portion of any monies received by the

patients from earnings received as a result of their workshop labors.

10.     The Debtor does not house any private paying patients and does not receive any

private funds.

11.     Debtor first suffered financial hardship when the State of Illinois ordered a

Medicaid rate freeze in July 1993. As to the Debtor, the Medicaid rates remain frozen.

12.     This hardship was magnified by the State of Illinois' failure to adjust the capital

component of Debtor's per diem reimbursement rate to reflect Debtor's new facility's actual

---

[1] The State of Illinois calculates the per diem amount based on three components, each with multiple factors: (a) capital component, (b) support component, and (c) nursing program component. The capital component is comprised of the recipient's financials regarding bricks and mortar, working capital, vehicles, return on capital, and real estate taxes. The support component is designed to pay for the recipient's costs for housekeeping, maintenance, dietary services, food, and limited insurance. The nursing component is designed to pay for the recipient's costs for its nursing staff, direct care staff, nursing management, and nursing supplies, and is adjusted by the level of disability of the patients.

[2] It is the patient's responsibility to remit to the Debtor all social security and social security disability payments over $30.00 that are received by the patient. Some patients remit monies to the Debtor via electronic deposits while

capital costs. The formula currently used to calculate the capital component utilizes a 1993 multiplier—a point in time before Debtor moved to its new facility.

13.    Not only are the funds Debtor receives insufficient to cover Debtor's current actual costs, the funds received from the State of Illinois have been consistently three (3) weeks late—exasperating Debtor's cash flow problems.

14.    Due to the insufficient inflow of funds and the increase in the cost of care of its patients, the Debtor is faced with continuing liquidity problems that have led to the necessity for bankruptcy relief.

15.    The Debtor's financial difficulties led it to file a petition for relief under Chapter 11 of the Bankruptcy Code on February 5, 2002. The resulting case, No. 02-04549, was administered by Judge Squires. A plan of reorganization was confirmed on December 24, 2002 and the case was closed on or about July 10, 2003.

16.    Since emerging from its previous Chapter 11 case, the Debtor has experienced increases in its expenses that necessitate the commencement of another Chapter 11 case. For instance, Golfview anticipates a 20% increase in its rental costs this year due to increased real estate taxes which are passed through to Golfview pursuant to its lease. Additionally, the wages of union employees at Golfview have increased 12% since January, 2003.

## Relief Requested

17.    The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of this chapter 11 case. These guidelines require chapter 11 debtors to, among other things: (a) close all existing

---

some patients remit monies to the Debtor via personal check. The thirty dollar portion of the Social Security checks, if remitted to the Debtor, is deposited to a patient trust account over which Debtor acts as trustee.

bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of accounts.

18.    Prior to the commencement of this case, in the ordinary course of business, the Debtor maintained four (4) bank accounts in the United States in the Debtor's centralized cash management system. These accounts are:

| Bank | Account Number | Type of Account |
|------|----------------|-----------------|
| Parkway Bank & Trust Co. | 07-546-9 | Payroll Account |
| Parkway Bank & Trust Co. | 07-551-5 | Representative Payee (Trust)- Account |
| Parkway Bank & Trust Co. | 07-545-0 | General Account |
| Parkway Bank & Trust Co. | 0100070771 | Savings Account |

19.    The Debtor utilizes a centralized cash management system designed to efficiently collect: (a) the per diem funds received from the state, (b) the social security and social security disability payments received in trust for the Debtor's patients from the state and federal governments; (c) the social security and social security disability payment received from its patients; and (d) the wages earned by its patients at their vocational training center.

20.    All of the per diem payments from the state are received via mail and directly deposited into the General Account. The social security and social security disability payments are received via wire transfer and directly deposited in trust for the Debtor's patients in the General Account. The patients' personal funds allowance from the social security and disability payments are subsequently transferred to the Representative Payee (Trust) Account. And, the

payments from the vocational training center are received via had delivery and placed in the Representative Payee (Trust) Account.

21.     The Debtor uses the four accounts to transfer and disburse funds to operate its business.   The Debtor records accurately, on a daily basis, such collections, transfers, and disbursements.

22.     Once per month the Debtor sweeps out its share from the Representative Payee (Trust) Account and places it in the General Account.

23.     Once every two weeks, the Debtor transfers funds in the approximate amount of $140,000.00 from the General Account and into the Payroll Account from which it meets its payroll obligations.   The remaining payroll obligations (including authorized deductions and tax payments) in the approximate amount of $35,000.00 are paid directly out of the General Account.

24.     The Debtor does not routinely use its Savings Account.

25.     All remaining funds stay in the Debtor's General Account, from which the Debtor pays its business expenses.

26.     The Debtor seeks a waiver of the United States Trustee's requirement that the Accounts be closed and that new postpetition bank accounts be opened.  If enforced in this case, such requirements would cause enormous disruption in the Debtor's business and would impair the Debtor's efforts to pursue alternatives to maximize the value of its estate.  The disruption would be particularly severe in this case, because the Debtor receives a significant amount of its operating monies from government entities via wire transfer/direct deposit.  The quantity of red tape and amount of time involved to change the direct deposit account of an entity that receives governmental funds is astronomical.  Adding to the severity in this case is the fact that the

Debtor's payroll obligations need to be paid on July 15, 2005. There will be no opportunity to put into place an alternative payment system before payroll obligations become due. The Debtor needs to maintain the Accounts in order to continue to receive funds without disruption or delay and to meet its payroll obligations. Indeed, as explained in more detail above, the Accounts comprise an established cash management system that the Debtor needs to maintain in order to ensure smooth collections and disbursements in the ordinary court.

27.    The Debtor believes that all Accounts are in financially stable banking institutions with FDIC insurance.

28.    In other cases, such as this one, it has been recognized that the strict enforcement of bank account closing requirements does not serve the rehabilitative purposes of chapter 11. Accordingly, courts in other cases have waived such requirements and replaced them with alternative procedures that provide the same protections.    See, e.g., *Outboard Marine Corporation*, Case No. 00-37405 (EIK) (Bankr. N.D. Ill. Dec. 22, 2000); *Source One Wireless, Inc.*, Case No. 99-13841 (ERW) (Bankr. N.D. Ill. Feb. 1, 2000); *Ben Franklin Retail Stores, Inc.*, Case No. 96-19482 (RB) (Bankr. N.D. Ill. July 26, 1996); *Envirodyne Industries, Inc.*, Case No. 93-0319 (JDS) (Bankr. N.D. Ill. January 1, 1993); *In re Venture Stores, Inc.*, No. 98-101 (D. Del. January 20, 1998) (Judge McKelvie).   Judge Squires approved a similar motion in Golfview's previous bankruptcy case.   A copy of the Order entered by Judge Squires is attached hereto as Exhibit 1.

29.    Accordingly, in order to avoid delays in the Debtor's receipt of payments from its primary source, to avoid delays of payments to Debtor's administrative creditors, and employees, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in

the Debtor's efforts to successfully and rapidly complete this case, it is important that the Debtor be permitted to continue to maintain its existing Accounts.

30.    In sum, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Accounts be deemed debtor-in-possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

31.    The Debtor represents that if the relief requested in this Motion is granted, it will not pay, and each of the banks at which the Accounts are maintained will be directed not to pay, any debts incurred before the Petition Date other than as authorized by this Court.

32.    In order to use the property of its estate and to ensure an orderly transition into chapter 11, the Debtor also requests authority to continue to use its existing cash management system as it may be modified in connection with the Debtor's contemplated debtor-in-possession financing, authority for which is sought by separate motion.

33.    As described above, in the ordinary course of business, the Debtor uses an integrated cash management system which facilitates cash reporting, monitors collections and disbursement of funds, and administers the various Accounts required for the collection, disbursement, and movement of case.

34.    The Debtor's cash management system is complex, highly automated and computerized. This allows the Debtor to centrally manage all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and

readily ascertainable.  The Debtor will continue to maintain detailed records reflecting all transfers of funds.

35.     The operation of the Debtor's business requires that the cash management system continue uninterrupted.  A requirement that the Debtor adopt new, segmented cash management systems at this critical stage of this case would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive. This is especially true in light of Debtor's one-person accounting department.  Indeed, such a change could irreparably harm the Debtor, its estate and creditors by creating cash flow interruptions while systems were changed.  In particular, the Debtor would face significant difficulty in meeting its upcoming payroll obligations.  Consequently, maintenance of the existing cash management system during this initial phase of the chapter 11 is in the best interests of all creditors and other parties-in-interest.

36.     Accordingly, the Debtor requests that all banks at which the Accounts are maintained be authorized and directed to continue to administer the Accounts as such accounts were maintained prepetition, without interruption and in the usual and ordinary course, and to pay any and all checks, drafts, wires, or transfers issued on the Accounts due to any claims arising on or after the Petition Date so long as sufficient funds are available in said Accounts.

37.     In order to minimize expenses to its estate, the Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterheads, purchase orders, and invoices) and checks existing immediately prior to the Petition Date without reference to the Debtor's status as debtor-in-possession.

38.    Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as debtor-in-possession as a result of the direct notice being mailed to each of the Debtor's vendors.

39.    Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.  For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor-In-Possession" one each.  See, e.g., *In re Gold Standard Baking, Inc.*, 179 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995) (holding United States Trustee's requirement prohibiting issuance of checks without "debtor-in-possession" designation to be unenforceable).

40.    Courts in other large cases have routinely granted the same or similar relief to chapter 11 debtors.  See, e.g., *Outboard Marine Corporation*, Case No. 00-37405 (EIK) (Bankr. N.D. Ill. Dec. 22, 2000); *Source One Wireless, Inc.*, Case No. 99-13841 (ERW) (Bankr. N.D. Ill. Feb. 1, 2000); *Ben Franklin Retail Stores, Inc.*, Case No. 96-19482 (RB) (Bankr. N.D. Ill. July 26, 1996); *Envirodyne Industries, Inc.*, Case No. 93-0319 (JDS) (Bankr. N.D. Ill. January 1, 1993); *In re Venture Stores, Inc.*, No. 98-101 (D. Del. January 20, 1998) (Judge McKelvie).

### Notice

41.    The Debtor has served notice of this Motion on the Office of the United States Trustee and the Debtor's twenty largest unsecured creditors.

WHEREFORE, the Debtor respectfully requests that this Court enter an order authorizing the following, subject to any order authorizing post-petition financing: (a) maintenance of existing bank accounts, (b) continued use of existing business forms, (c) continued use of the

existing cash management system, (d) dissolving the Citation to Discover Debtor's Assets issued

to Parkway Bank & Trust and ordering Parkway Bank & Trust to return Debtor's frozen funds to

the General Account, and that this Court grant such other and further relief as is just and proper.

Dated: July $\underline{12}$, 2005

                              Respectfully submitted,


                              GOLFVIEW DEVELOPMENTAL CENTER, INC.


                    By:    _____
                              One of its Proposed Attorneys


David J. Fischer (Atty. #813745)
Scott A. Semenek (Atty. #6209999)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606
tele.    (312) 201-2000
fx.      (312) 201-2555
semenek@wildmanharrold.com

EOD   FEB 1 3 2002

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| GOLFVIEW DEVELOPMENTAL CENTER, INC., | ) | Case No. 02-04549 |
| | ) | |
| | ) | Honorable John H. Squires |
| Debtor. | ) | |
| | ) | |

### ORDER UNDER 11 U.S.C. §§ 105, 363, 1107, AND 1108
### AUTHORIZING USE (A) CENTRALIZED CASH MANAGEMENT SYSTEM, (B)
### EXISTING BANK ACCOUNTS, AND (C) EXISTING BUSINESS FORMS

This matter coming before the Court on the Motion of Debtor and Debtor in Possession

(the "Debtor") for an order seeking pursuant to 11 U.S.C. §§ 105, 363, 1107 and 1108

authorizing the Debtor's continued use of existing (a) cash management system, (b) bank

accounts, and (c) business forms, and for an order dissolving the Citation to Discover Debtor's

Assets issued prepetition to Parkway Bank & Trust ("the Motion"). The Court having reviewed

the Motion and having heard the statements of counsel regarding the relief requested in the

Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion and the Hearing was sufficient

under the circumstances; and the Court having determined that the legal and factual bases set

forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.  Debtor shall maintain existing bank accounts:

| Bank | Account Number | Type of Account |
|---|---|---|
| Parkway Bank & Trust Co. | 07-546-9 | Payroll Account |
| Parkway Bank & Trust Co. | 07-551-5 | Representative  Payee |

**EXHIBIT**

**1**

1

|  |  | (Trust)- Account |
|---|---|---|
| Parkway Bank & Trust Co. | 07-545-0 | General Account |
| Parkway Bank & Trust Co. | 0100070771 | Savings Account |

2.    Debtor shall continue to use existing business forms;

3.    Debtor shall continue to use the existing cash management system; and

4.    The Citation To Discover Debtor's Assets issued to Parkway Bank & Trust is

dissolved and Parkway Bank & Trust shall return the funds frozen to the Debtor's

General Account.

**12 FEB 2002**        _____

UNITED STATES BANKRUPTCY JUDGE

PREPARED BY:

_____

David J. Fischer (Atty. No. 813745)
Holly L. Tomchey (Atty. No. 6270740)
WILDMAN, HARROLD, ALLEN & DIXON
225 West Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 201-2000

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                          |     |                              |
|--------------------------|-----|------------------------------|
| IN RE:                   | )   | **Chapter 11**               |
|                          | )   |                              |
| **GOLFVIEW DEVELOPMENTAL** | )   | **Case No. 05-27057**        |
| **CENTER, INC.,**        | )   |                              |
|                          | )   | **Honorable Jacqueline P. Cox** |
| Debtor.                  | )   |                              |
|                          | )   |                              |

## APPLICATION FOR ORDER AUTHORIZING
## EMPLOYMENT AND RETENTION OF WILDMAN, HARROLD
## ALLEN & DIXON LLP AS ATTORNEYS FOR THE DEBTOR

Golfview Developmental Center, Inc., debtor and debtor-in-possession in this Chapter 11

case (the "Debtor") requests by this application (this "Application"), filed pursuant to

section 327(a) of title 11, United States Code (the "Bankruptcy Code") and Rule 2014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), entry of an order authorizing

the Debtor to retain and employ the law firm of Wildman, Harrold, Allen & Dixon LLP on an

advance payment retainer, as attorneys to the Debtor in this Chapter 11 case, effective as of the

date hereof.  In support thereof, the Debtor respectfully represents and states as follows:

### Jurisdiction

1.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief requested herein are section 327 of the Bankruptcy Code and Bankruptcy

Rule 2014.

## Background

2.     On July 7, 2005 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in the management and possession of its business as debtor in possession.

3.     No trustee or examiner has been appointed in this chapter 11 case, and no committee has been appointed or designated.

4.     The Debtor organized on September 19, 1977, as an Illinois corporation.  As of the date of this Petition, the Debtor's principal place of business is located at 9555 West Golf Road, Des Plaines, Illinois  60016-1599.

5.     The Debtor has one shareholder, Bertram Miner.

6.     The Debtor has been operating as a long-term care facility for developmentally disabled adults since 1977.  At all relevant times, the Debtor has been licensed by the State of Illinois Department of Public Health as an Intermediate Care Facility for the Developmentally Disabled, with a capacity of 135 unrestricted beds.

7.     Originally, the Debtor operated in a building constructed in the 1950's located at 9555 West Golf Road, Des Plaines, Illinois.  However, Debtor moved to a newly constructed facility located on the formerly vacant lot and parking lot adjacent to the original facility.

8.     The Debtor provides the following services to its approximately 135 patients:

a.        nursing care and supervision;
b.        life skills training;
c.        financial skills training;
d.        self medication training;
e.        sexual education;
f.        developmental and prevocational training;
g.        behavior management counseling;
h.        occupational rehabilitation;
i.        physical rehabilitation;

j.      speech rehabilitation;
k.      social services;
l.      meals and dietary services;
m.      housekeeping and maintenance services;
n.      recreational and therapeutic activities;
o.      field trips; and
p.      maintenance.

9.      All of the Debtor's clients are inpatients whose care is funded directly by the State
of Illinois and indirectly through the State of Illinois and the federal government. The Debtor
receives a proscribed per diem rate of $144.01 per patient based on a certain statutory
calculation.[1] The State of Illinois, through the Department of Human Services, pays the per diem
directly to the Debtor but reduces the per diem amount by any social security and social security
disability payments over $30.00 each that are received by the patient from the government.[2] The
State of Illinois also reduces the per diem amount by a portion of any monies received by the
patients from earnings received as a result of their workshop labors.

10.     The Debtor does not house any private paying patients and does not receive any
private funds.

11.     Debtor first suffered financial hardship when the State of Illinois ordered a
Medicaid rate freeze in July 1993. As to the Debtor, the Medicaid rates remain frozen.

12.     This hardship was magnified by the State of Illinois' failure to adjust the capital
component of Debtor's per diem reimbursement rate to reflect Debtor's new facility's actual

---

[1] The State of Illinois calculates the per diem amount based on three components, each with multiple factors: (a) capital component, (b) support component, and (c) nursing program component. The capital component is comprised of the recipient's financials regarding bricks and mortar, working capital, vehicles, return on capital, and real estate taxes. The support component is designed to pay for the recipient's costs for housekeeping, maintenance, dietary services, food, and limited insurance. The nursing component is designed to pay for the recipient's costs for its nursing staff, direct care staff, nursing management, and nursing supplies, and is adjusted by the level of disability of the patients.

[2] It is the patient's responsibility to remit to the Debtor all social security and social security disability payments over $30.00 that are received by the patient. Some patients remit monies to the Debtor via electronic deposits while

capital costs. The formula currently used to calculate the capital component utilizes a 1993 multiplier—a point in time before Debtor moved to its new facility.

13.     Not only are the funds Debtor receives insufficient to cover Debtor's current actual costs, the funds received from the State of Illinois have been consistently three (3) weeks late—exasperating Debtor's cash flow problems.

14.     Due to the insufficient inflow of funds and the increase in the cost of care of its patients, the Debtor is faced with continuing liquidity problems that have led to the necessity for bankruptcy relief.

15.     The Debtor's financial difficulties led it to file a petition for relief under Chapter 11 of the Bankruptcy Code on February 5, 2002. The resulting case, No. 02-04549, was administered by Judge Squires. A plan of reorganization was confirmed on December 24, 2002 and the case was closed on or about July 10, 2003.

16.     Since emerging from its previous Chapter 11 case, the Debtor has experienced increases in its expenses that necessitate the commencement of another Chapter 11 case. For instance, Golfview anticipates a 20% increase in its rental costs this year due to increased real estate taxes which are passed through to Golfview pursuant to its lease. Additionally, the wages of union employees at Golfview have increased 12% since January, 2003.

### Relief Requested

17.     By this application, the Debtor seeks authority to retain and employ Wildman, Harrold, Allen & Dixon LLP as its counsel in this chapter 11 case, pursuant to sections 327(a), 328 and 1107 of the Bankruptcy Code, effective as of the Petition Date. Accordingly, the Debtor respectfully requests the entry of an order pursuant to sections 327(a) and 329 of the Bankruptcy

---

some patients remit monies to the Debtor via personal check. The thirty dollar portion of the Social Security checks, if remitted to the Debtor, is deposited to a patient trust account over which Debtor acts as trustee.

Code authorizing it to employ and retain Wildman, Harrold, Allen & Dixon LLP as its counsel under a retainer to perform the legal services that will be necessary during this Chapter 11 case.

18.     The Debtor seeks to retain the firm of Wildman, Harrold, Allen & Dixon LLP as its attorneys because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code and because of its expertise, its ability to respond quickly to emergency hearings and other emergency matters in this Court, and because Wildman, Harrold, Allen & Dixon LLP's appearance before this Court for the miscellaneous applications, motions and matters in this Chapter 11 proceeding will be efficient and cost effective for the Debtor's estate. Accordingly, the Debtor believes that Wildman, Harrold, Allen & Dixon LLP is both well qualified to represent the Debtor in its Chapter 11 case in a most efficient and timely manner.

19.     The professional services that Wildman, Harrold, Allen & Dixon LLP will render to the Debtor include, but shall not be limited to, the following:

> (a)     advise the Debtor with respect to its powers and duties as debtor and debtor-in-possession in the continued management and operation of its business and properties;

> (b)     attend meetings and negotiate with representatives of creditors and other parties in interest and advise and consult on the conduct of the case, including all of the legal and administrative requirements of operating in chapter11;

> (c)     advise the Debtor in connection with any contemplated sales of assets or business combinations, including the negotiation of asset, stock purchase, merger or joint venture agreements, formulate and implement bidding procedures, evaluate competing offers, draft appropriate corporate documents with respect to the proposed sales, and counsel the Debtor in connection with the closing of such sales;

> (d)     advise the Debtor in connection with post-petition financing and cash collateral arrangements and negotiating and drafting documents relating thereto, provide advice and counsel with respect to pre-petition financing arrangements, and negotiate and draft documents relating thereto;

> (e)     advise the Debtor on matters relating to the evaluation of the assumption, rejection or assignment of unexpired leases and executory contracts;

(f)     provide advice to the Debtor with respect to legal issues arising in or relating to the Debtor's ordinary course of business including attendance at senior management meetings, meetings with the Debtor's financial advisors and meetings of the Debtor's members, and advice on employee, workers' compensation, employee benefits, labor, tax, environmental, banking, insurance, securities, corporate, business operation, contracts, joint ventures, real property, press/public affairs and regulatory matters;

(g)     prepare on behalf of the Debtor all motions, applications, answers, orders, reports and papers necessary to the administration of the estate;

(h)     appear before this Court, any appellate courts, and the U.S. Trustee, and protect the interests of the Debtor's estate before such courts and the U.S. Trustee;

(i)     (i)     take all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on its behalf, the defense of any actions commenced against its estate, negotiations concerning all litigation in which the Debtor may be involved and objections to claims filed against the estate;

(j)     negotiate and prepare on the Debtor's behalf plan(s) of reorganization, disclosure statement(s) and all related agreements and/or documents and take any necessary action on behalf of the Debtor to obtain confirmation of such plan(s);

(k)     attend meetings with third parties and participate in negotiations with respect to the above matters; and

(l)     perform all other necessary legal services and provide all other necessary legal advice to the Debtor in connection with this chapter11 case.

20.     Subject to court approval in accordance with Section 330(a) of the Bankruptcy Code, compensation will be payable to Wildman, Harrold, Allen & Dixon LLP on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the Firm.  At present, Wildman, Harrold, Allen & Dixon LLP provides legal services at rates ranging from $320 to $520 per hour for partners and of counsel, $195 to $295 per hour for associates, and $80 to $180 per hour for paralegals and clerks.  The hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions.

21.     The hourly rates set forth above are Wildman, Harrold, Allen & Dixon LLP's standard hourly rates for work of this nature.  These rates are set at a level designated to fairly compensate the Firm for the work of its attorneys and paralegals and to cover fixed and routine

overhead expenses. It is the Firm's policy to charge its clients in all areas of practice for all other expenses incurred in connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier toll and other charges, mail and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, expenses for "working meals," computerized research, transcription costs, as well as non-ordinary overhead expenses such as secretarial and other overtime. The Firm will charge the Debtor for these expenses in a manner and at rates consistent with charges made generally to the Firm's other clients. The Firm believes that is fairer to charge these expenses to the clients incurring them than to increase the hourly rates and spread the expenses among all clients.

22.     To the best of the Debtor's knowledge, except as disclosed herein and in the annexed affidavit of David J. Fischer (the "Fischer Affidavit"), Wildman, Harrold, Allen & Dixon LLP has not represented the Debtor's creditors, equity security holders, or any other parties-in-interest, or their respective attorneys, in any matter relating to the Debtor or its estates. Wildman, Harrold, Allen & Dixon LLP, however, may have represented or may currently represent certain creditors of the estates in connection with matters unrelated to this Chapter 11 case. Wildman, Harrold, Allen & Dixon LLP is conducting a continuing inquiry into any matters which would affect the Firm's disinterested status. A final executed copy of the Affidavit will be filed prior to the hearing on the Motion. In the event additional disclosure is necessary, the Firm shall file a supplemental affidavit setting forth any facts and circumstances relevant thereto.

23.     The Debtor desires to retain Wildman, Harrold, Allen & Dixon LLP under a general retainer because of the extensive legal services that may be required and the fact that the nature and extent of such services are not known at this time. To the best of the Debtor's knowledge and except as otherwise disclosed in the Fischer Affidavit, Wildman, Harrold, Allen

& Dixon LLP does not hold or represent any interest adverse to the Debtor's estates, and Wildman, Harrold, Allen & Dixon LLP is a "disinterested person" as that phrase is defined in Section 101(14) of the Code. Wildman, Harrold, Allen & Dixon LLP's employment is necessary and in the best interests of the Debtor and its estate.

24.     Wildman, Harrold, Allen & Dixon LLP has received a retainer in the amount of $15,000.00 for its post-petition services and expenses to be rendered or incurred for or on behalf of the Debtor. Wildman, Harrold, Allen & Dixon LLP will apply the retainer to its legal fees as and only as approved by the Court.

### Notice

25.     The Debtor has served notice of this Application on the Office of the United States Trustee and the Debtor's twenty largest unsecured creditors.

WHEREFORE, the Debtor requests that this Court enter an order authorizing employment and retention of Wildman, Harrold, Allen & Dixon LLP as attorneys for the Debtor and that this Court grant such other and further relief as is just and proper.

Dated: July 12, 2005.                    Respectfully submitted,

GOLFVIEW DEVELOPMENTAL CENTER, INC.

By:     _____
        One of its Proposed Attorneys

David J. Fischer (Atty. #813745)
Scott A. Semenek (Atty. #6209999)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
(312) 201-2000

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| GOLFVIEW DEVELOPMENTAL | ) | Case No. 05-27057 |
| CENTER, INC., | ) | |
| | ) | Honorable Jacqueline P. Cox |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING (i) SECURED POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364(c) and (d) AND (ii) ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 364.

Golfview Developmental Center, Inc., debtor and debtor-in-possession in this Chapter 11 case (the "Debtor") requests by this motion (the "Motion") entry of interim and final orders authorizing the Debtor to (i) obtain a postpetition loan (the "Postpetition Financing"), up to an aggregate principal amount not to exceed $950,000, plus accrued interest on the aggregate principal amount, from Bertram Miner ("Lender"), (ii) grant to the Lender, pursuant to section 364(c) and (d) of the Bankruptcy Code, security interests in all of its currently owned and after acquired property to secure the Debtor's obligations under the Postpetition Financing, and (iii) grant the Lender priority in payment with respect to such Postpetition Financing over any and all administrative expenses of the kinds specified in sections 503(b) and 507 of the Bankruptcy Code. In support of the Motion, the Debtor respectfully states as follows:

### JURISDICTION

1.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory

predicates for the relief requested herein are section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.

## Background

2.      On July 7, 2005 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in the management and possession of its business as debtor in possession.

3.      No trustee or examiner has been appointed in this chapter 11 case, and no committee has been appointed or designated.

4.      The Debtor organized on September 19, 1977, as an Illinois corporation. As of the date of this Petition, the Debtor's principal place of business is located at 9555 West Golf Road, Des Plaines, Illinois 60016-1599.

5.      The Debtor has one shareholder, Bertram Miner.

6.      The Debtor has been operating as a long-term care facility for developmentally disabled adults since 1977. At all relevant times, the Debtor has been licensed by the State of Illinois Department of Public Health as an Intermediate Care Facility for the Developmentally Disabled, with a capacity of 135 unrestricted beds.

7.      Originally, the Debtor operated in a building constructed in the 1950's located at 9555 West Golf Road, Des Plaines, Illinois. However, Debtor moved to a newly constructed facility located on the formerly vacant lot and parking lot adjacent to the original facility.

8.      The Debtor provides the following services to its approximately 135 patients:

a.      nursing care and supervision;
b.      life skills training;
c.      financial skills training;

d.       self medication training;
e.       sexual education;
f.       developmental and prevocational training;
g.       behavior management counseling;
h.       occupational rehabilitation;
i.       physical rehabilitation;
j.       speech rehabilitation;
k.       social services;
l.       meals and dietary services;
m.       housekeeping and maintenance services;
n.       recreational and therapeutic activities;
o.       field trips; and
p.       maintenance.

9.     All of the Debtor's clients are inpatients whose care is funded directly by the State of Illinois and indirectly through the State of Illinois and the federal government. The Debtor receives a proscribed per diem rate of $144.01 per patient based on a certain statutory calculation.[1] The State of Illinois, through the Department of Human Services, pays the per diem directly to the Debtor but reduces the per diem amount by any social security and social security disability payments over $30.00 each that are received by the patient from the government.[2] The State of Illinois also reduces the per diem amount by a portion of any monies received by the patients from earnings received as a result of their workshop labors.

10.    The Debtor does not house any private paying patients and does not receive any private funds.

---

[1] The State of Illinois calculates the per diem amount based on three components, each with multiple factors: (a) capital component, (b) support component, and (c) nursing program component. The capital component is comprised of the recipient's financials regarding bricks and mortar, working capital, vehicles, return on capital, and real estate taxes. The support component is designed to pay for the recipient's costs for housekeeping, maintenance, dietary services, food, and limited insurance. The nursing component is designed to pay for the recipient's costs for its nursing staff, direct care staff, nursing management, and nursing supplies, and is adjusted by the level of disability of the patients.

[2] It is the patient's responsibility to remit to the Debtor all social security and social security disability payments over $30.00 that are received by the patient. Some patients remit monies to the Debtor via electronic deposits while some patients remit monies to the Debtor via personal check. The thirty dollar portion of the Social Security checks, if remitted to the Debtor, is deposited to a patient trust account over which Debtor acts as trustee.

11.     Debtor first suffered financial hardship when the State of Illinois ordered a Medicaid rate freeze in July 1993. As to the Debtor, the Medicaid rates remain frozen.

12.     This hardship was magnified by the State of Illinois' failure to adjust the capital component of Debtor's per diem reimbursement rate to reflect Debtor's new facility's actual capital costs. The formula currently used to calculate the capital component utilizes a 1993 multiplier—a point in time before Debtor moved to its new facility.

13.     Not only are the funds Debtor receives insufficient to cover Debtor's current actual costs, the funds received from the State of Illinois have been consistently three (3) weeks late—exasperating Debtor's cash flow problems.

14.     Due to the insufficient inflow of funds and the increase in the cost of care of its patients, the Debtor is faced with continuing liquidity problems that have led to the necessity for bankruptcy relief.

15.     The Debtor's financial difficulties led it to file a petition for relief under Chapter 11 of the Bankruptcy Code on February 5, 2002. The resulting case, No. 02-04549, was administered by Judge Squires. A plan of reorganization was confirmed on December 24, 2002 and the case was closed on or about July 10, 2003.

16.     On December 14, 2004, the Debtor and the Lender entered into a Revolving Loan Agreement whereby the Lender agreed to provide a credit line of up to $950,000 to the Debtor and the Debtor granted to the Lender a security interest in substantially all of the Debtor's assets. A copy of the Revolving Loan Agreement is attached hereto as Exhibit 1. A copy of a related Promissory Note is attached hereto as Exhibit 2.

17.     Since emerging from its previous Chapter 11 case, the Debtor has experienced increases in its expenses that necessitate the commencement of another Chapter 11 case. For

1552118_1.DOC                                         4

instance, Golfview anticipates a 20% increase in its rental costs this year due to increased real estate taxes which are passed through to Golfview pursuant to its lease. Additionally, the wages of union employees at Golfview have increased 12% since January, 2003.

## POSTPETITION FINANCING

18.    The Debtor and the Lender have agreed to the terms of a postpetition revolving loan, the terms of which will be embodied in Loan Documents and which are as follows:

> a.    The Lender will make available to the debtor a revolving line of credit in the aggregate amount not to exceed $950,000, to enable the Debtor to take down postpetition loans as needed. These Loans will be immediately repaid upon the payment by the Illinois Department of Human Services to the Debtor. All indebtedness shall bear an interest at a rate of Prime plus 1% per annun (but in any event not less than 8% per annun and no greater than 10% per annun) on unpaid principal balance from time to time outstanding. The Default Rate shall be 12% per annun on the unpaid principal balance from time to time outstanding.

19.    The Lender is to be granted as security for the repayment of all of Debtor's tangible and intangible assets pursuant to sections 363, 364(c)(2), 364(c)(3), and 363(d)(1) of the Bankruptcy Code, a valid and perfected first lien, subject only to prior claims on all present and after-acquired personal and real property of the Debtor of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtor, all accounts receivable, equipment, intangibles, and payment intangibles, all causes of action existing as of the Petition Date and the proceeds thereof, all causes of action arising under the Bankruptcy Code including avoidance actions against the Lender under Bankruptcy Code sections 544 through 553 inclusive, and proceeds from the sale, transfer, or pledge thereof, and all real property, the title to which is held by any Debtor, or possession of which is held by any Debtor pursuant to leasehold interests (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral").

20.     Other than the first priority liens and security interests in favor of Lender pursuant to the Loan Documents, no other claims, liens or security interests whether prior to or *pari passu* with the claims, liens or security interests in favor of Lender shall attach to the DIP Collateral in these or any subsequent or superceding cases (including without limitation, any conversion of any of the Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto) without the express written consent of the Lender (which consent may be withheld in its sole discretion).

21.     No liens or security interests granted to the Lender in the DIP Collateral, and no claim of Lender, shall be subject to subordination to any other liens, security interests or claims under section 510 of the Bankruptcy Code or otherwise.

22.     Any security interest or liens upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under section 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the Lender upon the DIP Collateral.

23.     The Debtor will waive and release any and all causes of action and claims against the Lender, its agents, representatives, assigns and successors.

24.     No costs or expenses of administration or other charge, lien, assessment or claim incurred at any time by any person or entity shall be imposed against the Lender, its claims, or its collateral under section 506(c) of the Bankruptcy Code or otherwise.

25.     The Lender's liens on and security interests in the DIP Collateral and its administrative claims under section 364(c)(1) of the Bankruptcy Code shall be subordinate only to (a) the administrative expense claims approved by the Court for the fees, expenses and costs incurred at any time during the post-petition period ending on the Carve-Out Termination Date

by professionals retained by the Debtor pursuant to § 327 of the Code (the 'DIP's Professionals

and by the professionals retained by the Committee pursuant to § 1103(a) of the Code

(collectively, the "Committee Professionals") in an aggregate amount not to exceed $950,000 an

amount to be determined (the "Carve Out").

## RELIEF REQUESTED

26.     By this Motion, and as more specifically set forth in the proposed order, the

Debtor requests, among other things:

a.      authorization to obtain Postpetition Financing from the Lender, under
sections 364(c)(1), 364(c)(2) 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

b.      authorization to grant the Lender, pursuant to sections 364(c) and
364(d)(1) of the Bankruptcy Code, security interests in all of the Debtor's currently owned and
after acquired property to secure the Debtor's obligations under the Postpetition Financing;

c.      authorization to grant to the Lender, pursuant to sections 364(c)(2) and
364 (d)(1) of the Bankruptcy Code, a first priority, perfected security interest in, and lien (a
"Lien") upon all of the Debtor's right, title and interest in, to and under all Collateral that is not
otherwise encumbered by a validly perfected security interest or lien of someone other than the
Lender on the Petition Date;

d.      authorization to grant to the Lender, pursuant to section 364(d)(1) of the
Bankruptcy Code, a first priority, perfected Lien upon all of the Debtor's right, title and interest
in, to and under all Collateral;

e.      authorization to grant the Lender priority in payment with respect to such
Postpetition Financing over any and all administrative expenses of the kinds specified in sections
503(b) and 507(b); and

f.      authorization to use the proceeds of the Postpetition Financing for the
purposes set forth in the Order.

g.

## BASIS FOR RELIEF

*A.      Legal Standards.*

27.    **Approval Under Section 364(c) of the Bankruptcy Code**. The Debtor proposes
to obtain Postpetition Financing by providing security interests in and liens on the DIP Collateral
pursuant to sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code. The statutory
requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice
and hearing, that the debtor is "unable to obtain unsecured credit allowable under section
503(b)(1) of [the Bankruptcy Code] . . ." Section 364(c) financing is appropriate when the trustee
or debtor in possession is unable to obtain unsecured credit allowable as an ordinary
administrative claim.    In re Crouse Group, Inc., 71 B.R. 544, 549 (secured credit under
section 364(c) is authorized, after notice and hearing, upon a showing that unsecured credit
cannot be obtained).

28.    Courts have articulated a three-part test to determine whether a debtor is entitled
to section 364(c) financing:

(a)    The debtor is unable to obtain unsecured credit under section 364(6), i.e.,
by allowing a lender only an administrative claim;

(b)    The credit transaction is necessary to preserve the assets of the estate; and

(c)    The terms of the transaction are fair, reasonable and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

29.    **The Debtor Does Not Have An Alternative to the DIP Facility**. The evidence
at the hearing will show that the Debtor could not have obtained Postpetition Financing on an
unsecured basis. As will be shown, the potential sources of a postpetition credit facility for the
Debtor, obtainable on an expedited basis and on reasonable terms, were practically nonexistent.
In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender

before concluding that such credit is unavailable." Bray v. Shenandoah Federal Sav. and Loan Ass'n. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

30.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). Id. See also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988). Thus, the evidence introduced at the interim hearing will satisfy the requirement of section 364(c) that unsecured credit was unavailable to the Debtor.

31.    **Application of the Business Judgment Standard**.    After appropriate investigation and analysis, the Debtor's management concluded that the Postpetition Financing was the only alternative available under the circumstances of these cases. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis and within the scope of [its] authority under the Bankruptcy Code." Id. at 513-14 (footnotes omitted).

33.     The Debtor has exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the Postpetition Financing. The terms of the Postpetition Financing are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the Postpetition Financing and borrow funds from the Lender on the secured, administrative superpriority basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, and take the other actions contemplated by the Order and as requested herein.

34.     Without the liquidity provided by the Postpetition Financing, the Debtor's operations likely would grind to a halt. The Debtor would be unable to pay vendors, employees and other constituencies that are essential to their ability to operate. There is no reason to believe that the Debtor could have located a different postpetition lender offering terms more favorable than the Lender, and certainly not before all of the Debtor's limited cash resources were depleted by the search. The Debtor's management exercised their best business judgment in negotiating the Postpetition Financing that is presently before the Court.

35.     **The Postpetition Financing Is Necessary to Preserve Assets of the Debtor's Estate**. No party in interest can seriously contend that the Debtor does not need immediate

access to postpetition credit.  The Debtor has significant cash needs.  Access to credit is necessary to purchase supplies and services necessary to run a long-term care facility for mentally disabled adults.  Access to sufficient cash while awaiting per diem funds from the State is critical to the Debtor's survival.  In the absence of immediate access to cash and credit, the Debtor's suppliers may refuse to sell critical supplies and services to the Debtor, and the Debtor will be unable to care for and service its clients.

36.     For these reasons, access to credit under the Postpetition Financing is critical to enable Debtor to care for and service its clients and therefor keep its clients and continue to receive the per diem funds from the State.

37.     **The Terms of the Postpetition Financing Are Fair, Reasonable and Appropriate**.  The Debtor is unable to obtain unsecured credit allowable solely as an administrative expense.  The proposed Postpetition Financing reflects the exercise of sound and prudent business judgment.  The Debtor believes that they would not have been able to obtain financing on an unsecured basis.  In the Debtor's business judgment, the Postpetition Financing is the best financing option available under the circumstances of these cases.

38.     Like the facility approved in Sky Valley, the purpose of the Postpetition Financing is to enable the Debtor to maintain the value of its estate while formulating a confirmable plan of reorganization or liquidation.  See also In re First South Say. Ass'n, 820 F.2d 700, 710-15 (5th Cir. 1987).

39.     The proposed Postpetition Financing provides that the security interests and administrative expense claims granted to the Lender pursuant to section 364(c) of the Bankruptcy Code are subject to the Carve Out.  In Ames Dep't Stores, 115 B.R. 340 (Bankr. S.D.N.Y. 1990), the bankruptcy court found that such "carve-outs" are not only

reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

40.    Likewise, the various fees and charges required by the Lender under the Postpetition Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See In re Defender Drug Stores Inc., 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

41.    The fairness and reasonableness of the terms of the Postpetition Financing will be shown at the Interim and Final Hearings.

### B.    The Debtor Will Be Forced to Shut Down Their Operations And Liquidate, and Thus Suffer Immediate and Irreparable Harm, If the Motion Is Not Granted.

42.    The Debtor needs cash to operate. As explained in greater detail above, the Debtor must be able to timely pay vendors and employees to provide care to its clients.

43.    Accordingly, if the Debtor is not allowed to use its cash deposits and its business will shut down immediately and creditors will receive less on their claims than they would if the Debtor was permitted to continue to operate.

44.    If the Court denies the Debtor's request to obtain Postpetition Financing, the Debtor will suffer immediate and irreparable harm to its business. The Debtor does not believe credit is available from any alternative source at this time.

### C.    The Interests of the Lender Will Be Adequately Protected.

45.    The interests of the Lender in Collateral will be adequately protected because (1) the Debtor's going concern value will be preserved thus enhancing the ultimate recoveries of the

estates' creditors including the Lender, and (2) the Lender will be granted replacement liens and will continue to receive monthly interest payments throughout these cases.

**D.      Good Faith.**

43.      Inasmuch as the terms and conditions of the Postpetition Financing are fair and reasonable, and were negotiated by the parties in good faith and at arms' length, the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent of any and all of the provisions of the Postpetition Financing.

**E.      Notice of Hearing.**

46.      Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for this District; (b) Bertram Miner; (c) the twenty (20) largest unsecured creditors of the Debtor; and (d) known holders of prepetition liens against the Debtor's property.    The Debtor submits that, under the circumstances, no further notice of the interim hearing is necessary, and request that any further notice be dispensed with and waived.

47.      The Debtor respectfully requests that it be authorized to serve a copy of the signed Order authorizing postpetition financing which fixes the time and date for filing with objections, if any, by first class mail upon (i) counsel to any official committee of unsecured creditors appointed in these cases; (ii) the Office of the United States Trustee; (iii) counsel for the Lender; (iv) the twenty (20) largest unsecured creditors of the Debtor at their last known address; (v) all parties that have filed appearances in these cases; (vi) all known holders of prepetition liens against the Debtor's property; and (vii) all other parties ordered by the Court.    The Debtor requests that the Court consider such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court: (1) enter the attached
Interim Order granting the relief requested herein and scheduling a final hearing on post-petition
financing and (2) grant such other and further relief as is appropriate under the circumstances.

Dated: July 1 7, 2005

Respectfully submitted,

GOLFVIEW DEVELOPMENTAL CENTER, INC.

By: _____

One of its Proposed Attorneys

David J. Fischer (Atty. #813745)
Scott A. Semenek (Atty. No. 6209999)
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606
tele.    (312) 201-2000
fax      (312) 201-2555

# EXHIBIT 1

## REVOLVING LOAN AGREEMENT

Revolving Loan Agreement not to
exceed $950,000.00 in the aggregate

December 14, 2004
Chicago, Illinois

1.  **Credit Line Amount**   Subject to the terms and conditions of this post confirmation revolving loan agreement ("Loan Agreement"), BERTRAM L. MINER ("Lender") shall, at Lender's option, lend to Debtor, GOLFVIEW DEVELOPMENTAL CENTER, INC. ("the Borrower"), on or after December 14, 2004, such amounts as Borrower may from time to time request, but at any one time the outstanding aggregate principal shall not exceed $950,000.00 ("Credit Line").

2.  **Advances**   Individual advances ("Advances") shall be made, at Lender's option, by direct advance, not to exceed the Credit Line; provided, however, that the aggregate amount of all direct advances, less repayments, at any one time outstanding shall not exceed the Credit Line.   The Borrower shall notify the Lender before any proposed borrowing in writing on Borrower's letterhead, specifying the date and amount of such requested borrowing.

3.  **The Note**   Borrower's obligation to repay the Loan Agreement shall be evidenced by a promissory note in the form attached hereto as <u>Exhibit A</u> (the "Note").   Borrower promises to repay funds lent pursuant to the Loan Agreement on the terms and conditions set forth in the Note.

4.  **Use of Proceeds**   Borrower shall use the proceeds of the Loan Agreement solely to operate Borrower's business in its normal course ("Normal Course").

5.  **Loan to Borrower**   The Loan Agreement, the Advance, Lender's undertaking to make future Advances and all other financial accommodations made by Lender to Borrower under this Loan Agreement shall constitute separate obligations of Borrower secured by Lender's security interests in the Collateral.

6.  **Statements of Account**   Lender shall provide Borrower with statements of account on a monthly basis and each statement of account which is delivered by Lender to Borrower shall be presumed correct and accurate and shall constitute an account stated between Borrower and Lender, absent manifest error, unless thereafter waived in writing by Lender, or unless, within thirty (30) days after Borrower's receipt of said statement, Borrower delivers to Lender, written objection specifying the error or errors, if any, contained in any such statements.

7.  **Interest and Fees**

    1.0  **Interest Rate**:  The funds lent pursuant to this Loan Agreement shall bear interest at Prime plus 1% per annum (but in any event not less than 7% per annum) on the unpaid principal balance from time to time outstanding, until after an Event of Default (as defined in paragraph 12

**EXHIBIT
1**

REVOLVING LOAN AGREEMENT
Golfview Developmental Center, Inc., as Borrower
Bertram Miner, as Lender

below), in which case it shall bear interest at 18% per annum on the unpaid principal balance from time to time outstanding ("Default Rate").

2.0 **Interest Rate Payable**  Interest shall be payable on the first (1st) day of each month for the preceding month.

3.0 **Interest Accrual on Advances**    Interest on any Advance made under the Loan Agreement shall begin to accrue on the date Lender makes such Advance to Borrower.

8. **Term**  This Loan Agreement shall be effective on December 14, 2004, and shall continue to be in full force and effect for one year following the effective date.  Lender shall have the right to terminate this Loan Agreement if any Event of Default specified in paragraph 12 shall occur.  Upon termination of this Loan Agreement, Borrower shall pay the unpaid principal balance of the Loan Agreement, interest on the Loan Agreement to the date of repayment, plus all charges, fees and other amounts due Lender by Borrower under this Loan Agreement.

9. **Security Interest in the Collateral**  As security for the prompt payment of the Loan Agreement made by Lender to Borrower pursuant to this Loan Agreement and any extensions, renewals or amendments of such Loan Agreement, and the payment and performance of all other obligations under any other agreement between Borrower and Lender, of every kind, nature and description, direct or indirect, absolute or contingent, joint or several, whether due or to become due, matured or unmatured, liquidated or unliquidated, now existing or hereafter arising, including obligations of performance as well as obligations of payment, the Borrower hereby grants to Lender a continuing security interest in the following property and interests in property of Borrower, whether now owned or existing or later acquired or arising and wherever located: all accounts, accounts receivable, equipment, general intangibles, and payment intangibles, currently existing or hereinafter arising and all proceeds from the sale, transfer, or pledge of any or all of the forgoing property ("Collateral").  Notwithstanding this grant of a security interest, the Lender and Borrower acknowledge that the Lender is already secured by virtue of the Borrower's previous grant of a security interest in its Collateral which extends to renewals or amendments of such Loan Agreement and all other obligations under any other agreement between Borrower and Lender.

REVOLVING LOAN AGREEMENT
Golfview Developmental Center, Inc., as Borrower
Bertram Miner, as Lender

10.   **Warranties and Representations**

10.1   **Warranties and Representations of Borrower**   Borrower warrants
and represents that:

(a)   Borrower is an Illinois corporation duly organized, validly existing and
in good standing under the laws of the state of its organization;

(b)   Borrower has the right and power and is duly authorized and
empowered to enter into, execute, deliver and perform under this Loan
Agreement and the terms contained in this Loan Agreement are enforceable
against Borrower in accordance with their respective terms; and

(c)   The execution, delivery and performance by Borrower of this Loan
Agreement shall not, by the lapse of time, the giving of notice or otherwise,
constitute a violation of any applicable law or a breach of any provision
contained in Borrower's organizational documents or any provision contained
in any agreement, instrument or document to which Borrower is a party or by
which it is bound.

11.   **Covenants**

11.1   **Affirmative Covenants of Borrower**   Borrower covenants that it
shall, unless Lender consents otherwise, from December 8, 2004, through
the date of repayment of the Loan Agreement or extinguishment of all this
indebtedness (whichever occurs later):

(a)   Keep books and records of account, prepare and maintain financial
statements in accordance with generally accepted accounting principles
applied on a consistent basis and make such available to Borrower;

(b)   Timely file all federal, state and local tax returns and other reports
Borrower is required by law to file;

(c)   Conduct all business activities in strict conformity with all applicable
federal, state and local laws, regulations, orders and guidelines; maintain all
licenses, permits and similar authorizations required for the conduct of its
business;

(d)   Maintain and preserve all books of account and business records
relevant to the Collateral, Loan Agreement, Advance, liabilities, this
indebtedness, or in any way material or relevant to its covenants, duties,

assurances, warranties or obligations under this Loan Agreement (collectively, "Books and Records"); and

(e)   Provide Lender and its representatives reasonable access, during normal business hours to Books and Records.

11.2   **Negative Covenants of Borrower**   Without Lender's prior written consent, which shall not be unreasonably withheld by Lender, Borrower covenants that it shall not:

(a)   Make any distributions of its property or assets outside the Normal Course of its business;

(b)   Make any material change in its capital structure, or make any material change in any of its business objectives, purposes and operations;

(c)   Make any loans or other advances of money or property, to any Person (including, without limitation, any officer, director, equity owner, employee or affiliate of Borrower), other than advances to contractors in the ordinary course of business;

(d)   Enter into any transaction which could materially and adversely affect the Collateral or Borrower's ability to repay this indebtedness or any other liabilities;

(e)   Guarantee, or otherwise, in any way, become liable with respect to the obligations or liabilities of any Person except endorsement of instruments or items of payment for deposit in the ordinary course of business;

(f)   Encumber, pledge, mortgage, grant a security interest in, assign, sell, lease or otherwise dispose of or transfer, whether by sale, merger, consolidation, liquidation, dissolution, or otherwise, any Collateral except those security interests, granted in favor of Lender pursuant to this Loan Agreement;

(g)   Incur any Liabilities except for:  (1) this indebtedness; and (2) trade payables and other current Liabilities arising in the ordinary course of Borrower's business; and

(h)   Change its name without giving Lender thirty (30) days' notice of its intent to do so.

REVOLVING LOAN AGREEMENT
Golfview Developmental Center, Inc., as Borrower
Bertram Milner, as Lender

12.    **Events of Default; Rights and Remedies on Default**

12.1    **Events of Default**   An Event of Default hereunder is defined as a Default in paragraph 4 of the Note attached hereto as Exhibit A.

12.2    **Remedies**   Upon and during the continuation of an Event of Default, Lender shall have the following rights and remedies:

(a)    All Remedies set forth in paragraph 5 of the Note attached hereto as Exhibit A; and

(b)    Any obligation to advance funds under the Loan Agreement shall cease upon the happening of an Event of Default.

12.3    **Notice**   Any notice required to be given by Lender of a sale, lease, other disposition of the Collateral or any other intended action by Lender, given to Borrower in the manner set forth herein, ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Borrower.

13.    **General**

13.1    **Modification of Agreement**   This Loan Agreement may not be modified, altered or amended, except by an agreement in writing signed by Borrower and Lender, provided, however, that this section may not be amended in any circumstance.

13.2    **Sale of Interest**   Borrower and Lender may not sell, assign or transfer, in whole or in part, its interest in this Loan Agreement.

13.3    **Attorneys and Other Fees and Expenses**   If, at any time, following an Event of Default, Lender employs legal counsel to enforce any rights of Lender against Borrower, or any other Person which may be obligated to Lender by virtue of this Loan Agreement; then, in any such event, the attorneys' fees arising from such services and all reasonably incurred expenses, costs, charges and other fees of such counsel or third party or of Lender or relating to any of the events or actions described herein shall be payable, on demand, by Borrower to Lender and shall be additional indebtedness of Borrower under this Loan Agreement.  Additionally, if any taxes (other than taxes measured by the income or capital of Lender) shall be payable on account of the execution or delivery of this Loan Agreement, or the creation of any of this indebtedness, by reason of any existing or later enacted federal or state statute, Borrower will pay all such taxes, including,

but not limited to, any interest and/or penalty thereon, and will indemnify and hold Lender harmless from and against such liability.

13.4   **Waiver by Lender**   Lender's failure, at any time or any time later to require strict performance by Borrower of any provision of this Loan Agreement shall not waive, affect or diminish any right of Lender to demand strict compliance and performance. Any suspension or waiver by Lender of any Event of Default under this Loan Agreement shall not suspend, waive or affect any other event of Default under this Loan Agreement, whether the same is prior or subsequent and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Loan Agreement shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing signed by a duly authorized representative of Lender and directed to Borrower specifying such suspension or waiver and any such Event of Default shall be deemed to continue to exist after its occurrence, unless and until such written suspension or waiver is signed by Lender.

13.5   **Severability**   Wherever possible, each provision of this Loan Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Loan Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Loan Agreement.

13.6   **Parties**   This Loan Agreement shall be binding upon and inure to the benefit of the successors and assigns of Borrower and Lender.

13.7   **Waivers by Borrower**   Except as otherwise provided for in this Loan Agreement, Borrower waives (a) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any of all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (b) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; and (c) the benefit of all valuation, appraisement and exemption laws.

REVOLVING LOAN AGREEMENT
Golfview Developmental Center, Inc., as Borrower
Bertram Miner, as Lender

13.10 **Section Titles**   The Section titles contained in this Loan Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

13.11 **Entire Agreement**   This Loan Agreement and attached documents embody the entire agreement and understanding between the parties in respect of the transaction contemplated and supersede all prior negotiations, understandings and agreements between such parties in respect of such transactions.

IN WITNESS WHEREOF, this Loan Agreement has been duly executed as of the day and year specified at the beginning hereof.

LENDER:

BERTRAM MINER
BY:

Bertram Miner

BORROWER:

GOLFVIEW DEVELOPMENTAL CENTER, INC.
By:

Anthony R. Miner, President

# EXHIBIT 2

**Exhibit A**

## PROMISSORY NOTE

not to exceed $950,000 in the aggregate

December 14, 2004
Chicago, Illinois

1.     For value received, Debtor, GOLFVIEW DEVELOPMENTAL CENTER, INC. ("the Obligor") does hereby promise to pay to the order of the BERTRAM L. MINER ("the Holder") at Holder's address, 950 Sheridan Road, Glencoe, Illinois 60022, or at any such other address as the Lender may designate to the Obligor in writing, the outstanding principal balance plus interest on the Revolving Loan Agreement, as set forth below.

2.     **PAYMENT.** Payment shall be payable in lawful money of the United States at the aforesaid address of the Holder (or such other place as the Holder of this Note may designate to the Obligor in writing) immediately upon the per diem per patient payment made to Obligor by the State of Illinois pursuant to state statute for services rendered by Obligor to its patients, but in any event no later than one (1) business day following the receipt by Obligor of payment by the State of Illinois.

3.     **INTEREST.** This Note shall bear interest at Prime plus 1% per annum (but in any event not less than 7% per annum) on the unpaid principal balance from time to time outstanding, until after Default (as defined in paragraph 4), in which case it shall bear interest at 18% per annum on the unpaid principal balance from time to time outstanding ("Default Rate").

4.     **DEFAULT.** Any failure to make any payment required hereunder shall constitute a default hereunder ("Default").

5.     **HOLDER'S REMEDIES.** If a Default shall occur and be continuing, then the entire unpaid principal balance of this Note, together with Default interest accrued thereon, shall at the option of the Holder and without notice to the Obligor, become due and payable immediately with interest at the rate of 12% per annum on the unpaid principal balance outstanding, together with reasonable attorneys' fees and costs incurred for collection of this Note.

6.     **ATTORNEYS' FEES AND COSTS.** The Obligor promises to pay to the Holder all legal costs incurred after the commencement of litigation to enforce this Promissory Note, including reasonable attorneys' fees and costs for the enforcement of this Note.

7.     **WAIVER OF PRESENTMENT/NOTICE.** Except as specifically required herein, the Obligor waives presentment of payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note; the liability

**EXHIBIT
2**

REVOLVING LOAN AGREEMENT
Golfview Developmental Center, Inc., as Borrower
Bertram Miner, as Lender

of the Obligor hereunder shall be absolute and unconditional and shall not be affected in any manner by any indulgence, extension or time, renewal, waiver or modification granted or consented to by the Holder.

8.  **MISCELLANEOUS.**

   (a) The words "Holder" and "Obligor" whenever occurring herein shall be deemed and construed to include the respective successors and assigns of the Holder and the Obligor, provided, however, the Obligor may not assign this Note without the Holder's prior written consent.

   (b) THIS INSTRUMENT SHALL BE CONSTRUED ACCORDING TO AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS, EXCLUDING PROVISIONS RELATED TO CHOICE OF LAW.

IN WITNESS WHEREOF, the Obligor has duly executed this Promissory Note the day and year first above mentioned.

The OBLIGOR:

GOLFVIEW DEVELOPMENTAL CENTER, INC.
By:

Anthony R. Miner, President